**NORFOLK SOUTHERN BUS CORPORATION v. VIRGINIA DARE TRANSP. CO., Inc.**

**No. 5527.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 7, 1947.

James G. Martin, of Norfolk, Va., and J. Kenyon Wilson, of Elizabeth City, N. C. (S. Burnell Bragg and Arthur J. Winder, both of Norfolk, Va., on the brief), for appellant.

W. R. Ashburn, of Norfolk, Va., and J. C. B. Ehringhaus, of Raleigh, N. C. (Ehr-

inghaus & Ehringhaus, of Raleigh, N. C., on the brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

Two bus companies entered into a contract which gave rise to a claim and a counterclaim that form the subjects of this appeal. The validity of the contract is the prime feature of the controversy since the plaintiff corporation contends that the contract is invalid and brings suit for services rendered on the basis of a quantum meruit, while the defendant asserts the validity of the contract and files a counterclaim for its breach.

Prior to the execution of the contract, Virginia Dare Transportation Company was a carrier of freight by motor truck, operating under a franchise from the Interstate Commerce Commission between Norfolk, Virginia, and Elizabeth City, North Carolina, via Sligo, North Carolina, and thence to Manteo, North Carolina, and also between Norfolk and Manteo, without touching Elizabeth City. Some months before the inception of the contract Norfolk Southern Bus Corporation had entered into a contract, ultimately approved by the Interstate Commerce Commission, for the purchase of a franchise to carry freight by motor truck between various points in Virginia and North Carolina, including Norfolk and Elizabeth City, via Sligo, and was about to start operations. The contract was executed on June 6, 1940, to become effective thirty days from that date. It recited the ownership of the similar franchises by the two companies and declared that they had determined that friendly relations and mutual assistance in the development of the territory and service of the public would conduce to the financial stability and efficiency of the companies, and would serve the public interest. Therefore, it was agreed that they would consult together and seek to develop policies of cooperation compatible with regulatory statutes and that they would publish and file joint rates for the approval of the Interstate Commerce Commission and the state commissions regulating such matters. Specifically it was agreed that Norfolk Southern would establish and operate freight terminals at Norfolk and Elizabeth City, with pickup and delivery service, and would permit Virginia Dare to use them on a joint user basis, and that so long as Virginia Dare should operate no more than two round trips a week between these terminals, no charge would be made for the facilities and services furnished; but if Virginia Dare should operate more frequently, the tonnage handled on the additional trips would be allocated at the same unit costs as applied to Norfolk Southern in handling its own business. The agreement was made for a period of five years beginning July 6, 1940, and provided that both companies should have the right to renew it for an additional period of five years.

Prior to the contract period, Virginia Dare had rented terminals at Norfolk and Elizabeth City, had performed or arranged for its own pickup and delivery service at those places, and was running one or more round trips every day except Sunday. After July 6, 1940, Virginia Dare ran only two round trips each week on Tuesdays and Thursdays, and Norfolk Southern rendered all terminal and pickup and delivery services for Virginia Dare without charge. So the situation remained until the fall of 1944 when Norfolk Southern, upon the advice of counsel, declared the contract to be illegal, refused to continue further service to Virginia Dare after December 31, 1944, and brought suit for services rendered by it to Virginia Dare in the sum of $30,000. Virginia Dare defended the suit on the ground that the contract was valid and presented a counterclaim for breach of contract in the sum of $91,000. This sum it estimated to be its damages both for the remainder of the original five year period and for an additional five years for which it claimed that it was entitled to extend the contract under the renewal privilege.

Upon the trial the District Judge ruled that the contract was valid and directed the jury to render a verdict against Norfolk Southern on its claim, but left it to the jury to determine the damage to which Virginia Dare would be subjected by reason of the breach by Norfolk Southern during the period between January 1, 1945, and July 6,

1950. The jury found a verdict for Virginia Dare in the sum of $60,000.

■ The question as to the validity of the agreement turns to some extent upon its interpretation. Norfolk Southern contends that under the contract it agreed to furnish terminal facilities and pickup and delivery services to Virginia Dare at Norfolk and Elizabeth City without charge, if Virginia Dare would restrict its operations between these points to two round trips per week. Virginia Dare conceded that it did actually confine its operations to two round trips per week during the four and a half years in which the arrangement existed, but contends that it did not surrender the right to make additional trips because the contract expressly provided that if its schedule exceeded two trips per week, it was to pay the costs of the tonnage handled on the additional trips. These conflicting contentions, arising from the language of the contract and the method of its performance during a substantial period of time, indicate that the contract is not free from ambiguity and that the District Judge was in error in refusing to receive in evidence certain letters and certain testimony which indicate quite clearly the understanding by the parties and the purposes for which the agreement was drawn up. This testimony, which was taken out of the presence of the jury and rejected, showed it to be the intention of the parties that Virginia Dare was to operate only two days a week instead of six days a week, as it had previously done, and that Virginia Dare was to be allocated one-third and Norfolk Southern two-thirds of the net business, and that the revenues were to be divided at the end of the month on a one-third—two-thirds basis.

■ This evidence was admissible, not only because it cleared up the ambiguity of the contract, but also because it indicated that the written instrument did not contain the entire agreement between the parties; and since the making of this contract and its performance were illegal acts, as we shall see, the court should not have applied the strict rule that extrinsic evidence may not be received to vary the terms of a written agreement, but should have opened the way for the light that revealed the true intention of the transaction. See 1 Williston on Contracts (6th Ed. 1937) § 28A; 3 Id. § 627; 6 Id. § 1630A; Restatement, Contracts § 600.

■ Virginia Dare seeks to avoid this conclusion by pointing out that the contract, as written, was susceptible of lawful performance and could have been lawfully performed for the rest of the first five-year period and all of the renewal period of five years, and that Virginia Dare is entitled to this performance and to damages for the breach, even though the methods actually employed during the preceding period were unlawful. But, we think that the interpretation given to the contract by the parties is the more reasonable and must control. It was not drawn by a lawyer and did not express as clearly as it might have done the obligation of Virginia Dare to abstain during two-thirds of the week; but its consistent and unbroken abstinence in this respect, the benefits it received thereby, and the division of the revenues on the agreed basis show all too clearly what the parties intended by the written document.

■ In effect, this interpretation and this performance restricted competition between the parties and reduced the transportation services and facilities available to the public in a manner which constituted in our opinion a violation of Section 1 of the Sherman Antitrust Act, 26 Stat. 209 (1890), 50 Stat. 693 (1937), 15 U.S.C.A. § 1 (1941), which provides that every contract in restraint of trade or commerce among the several states is illegal. The arrangement between the parties was similar, except as to the extent of the monopoly, to that described in Lee Line Steamers, Inc. v. Memphis, Helena & Rosedale Packet Co., 6 Cir., 277 F. 5, where two competing steamboat companies, each of which operated a steamer between two points on the Mississippi River, agreed to the division of the entire tonnage carried by the two lines, based on each steamer making two round trips each week, the earnings from the carriage of the tonnage to be settled for monthly on the basis of 50 per cent for each line. With respect to this agreement the court said, page 9 of 277 F.: " * * * That a complete unification of river freight transportation

between the points stated was contemplated and effected plainly appears by the terms of the contract, in connection with the concessions before referred to, including the provision for equal division of combined gross earnings, which effectually discouraged competition between the two lines with respect to furnishing facilities or bettering service—a monopoly made even the more certain by requiring the line failing to make its allotted number of trips to account to the other line on the basis of the average tonnage which it would have handled, and at the average price per ton which it would have received, if it had made the full number of scheduled trips. Plainly, the rights of the public were set entirely to one side, and it was left to the mercies of the combination."

■ We do not have a complete monopoly in the pending case because the parties here did not control the entire common carrier motor traffic between the terminals. There were four other motor carriers in the business, some of which later discontinued operations. But an agreement in restraint of trade or competition in violation of the Act may occur even though a complete monopoly does not result. For example, it was said in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, at page 221, 60 S.Ct. 811, 84 L.Ed. 1129, that any combination which tampers with price structures is engaged in an unlawful activity; and that, even though the members of the group are in no position to control the market, they directly interfere with the free play of market forces to the extent that they raise, lower or stabilize prices. Cf. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360, 374, 53 S.Ct. 471, 77 L.Ed. 825. The same rule is applicable to a combination whose result is substantially to restrict or cut down competition in the facilities and services previously offered by the parties to the public. United States v. Eastern States Retail Lumber Dealers' Ass'n, D.C.S.D.N.Y., 201 F. 581, affirmed 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788[1];

United States v. Terminal R. Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; Id., 236 U.S. 194, 35 S.Ct. 408, 59 L. Ed. 535. See United States v. Great Lakes Towing Co., D.C.N.D.Ohio, 208 F. 733, Id., D.C., 217 F. 656, appeal dismissed, 245 U.S. 675, 38 S.Ct. 8, 62 L.Ed. 542; United States v. General Motors Corp., 7 Cir., 121 F.2d 376, certiorari denied, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; Johnson v. Joseph Schlitz Brewing Co., D.C.E.D.Tenn., 33 F. Supp. 176; United States v. Swift & Co., D.C.D.Colo., 52 F.Supp. 476; Monongahela River Consol. Coal & Coke Co. v. Jutte, 210 Pa. 288, 59 A. 1088, 105 Am.St.Rep. 812, 2 Ann.Cas. 951.

Moreover, the evidence in the instant case indicates that the combination of the parties was not without its effect upon the rates offered to the shippers by motor transportation. The rejected testimony included that of the general freight agent of Norfolk Southern who testified that before the contract was entered into, Virginia Dare's first class rate was 32c and that in October, 1940, this rate was raised to 40c, in equality with the first class rate at which Norfolk Southern started business between the terminals. Furthermore, the rates of Norfolk Southern on certain articles were higher than those of Virginia Dare during the period of the performance of the contract so that one who shipped these articles by Virginia Dare on Tuesdays and Thursdays enjoyed a lower rate than if the shipments were made on other days of the week. The restriction of Virginia Dare to two days a week therefore tended to increase the cost of the transportation of these articles to the public.

■ Irrespective of the provisions of the Sherman Act, the contract between the parties lacked legal validity because it was in conflict with amendments to the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Chapter 8 of the Act was added on August 9, 1935, to bring the transportation of passengers or property in interstate commerce by motor carrier within the control of the Interstate Commerce Commission. See 49

---

[1] In this case the Supreme Court had no difficulty in concluding that the purpose of sending to the members of the retail dealers' association the names of wholesalers who sold at retail was to put the ban on such wholesalers, although there was no express agreement to that effect. See 234 U.S. at pages 608, 609, 34 S.Ct. at pages 952, 953.

U.S.C.A. App. § 301 et seq. (1945). Subsequently Section 5(1) of the statute was amended by the Act of September 18, 1940, so as to require the specific approval by the Commission of any contract between interstate motor carriers for the pooling or division of traffic or service. See 49 U.S.C.A. App. § 5(1) (1945). It is obvious that the agreement between the parties was of the very kind at which the statute was directed, because the arrangement of the business, as shown by the correspondence between the parties, contemplated that the traffic handled by them and the revenues derived therefrom should be divided monthly on the basis of one-third to Virginia Dare and two-thirds to Norfolk Southern.[2]

We have no difficulty in holding that it was unlawful for the parties hereto to enter into the contract except upon the specific approval by order of the Commission, and that their operation under the contract without securing such approval constituted an offense during each day of its continuance. 49 U.S.C.A. § 10(1). See Escanaba & Lake Superior R. Co. v. United States, 305 U.S. 315, 319, 58 S.Ct. 556, 82 L.Ed. 867; In re Pooling Freights, D.C.W.D. Tenn., 115 F. 588; Application of Texas & New Orleans R. R. Demurrage, 223 I.C.C. 437; Union Belt of Detroit Pooling of Revenues, 201 I.C.C. 577; Pooling of Passenger-Train Revenues and Services, 201 I.C.C. 699.

■ Nor is this conclusion affected by the fact that the agreement between the parties became operative before the amendment to the statute which subjected pooling agreements between motor carriers to the approval of the Interstate Commerce Commission. The declared will of Congress could not be thwarted by the continuance of the arrangement without the approval of the Commission after the amendment of the statute went into effect. See Philadelphia, Baltimore & Washington R. Co. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911; Louisville & Nashville R. Co. v. Mott-

ley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S. 671. The agreement should have been submitted to the approval of the Commission after the amendment became effective, and since it was not, it fell within the interdiction of the statute and was therefore unlawful and void. See authorities collected in Pittsburgh Plate Glass Co. v. Jarrett, D.C.M.D.Ga., 42 F.Supp. 723, 730, modified on other grounds, 5 Cir., 131 F.2d 674; Restatement, Contracts §§ 457, 608; 6 Williston on Contracts (6th Ed. 1938) § 1759.

■■ It follows therefore, that Virginia Dare has no ground on which to base its counterclaim. The damages sued for are occasioned by the failure of Norfolk Southern to perform the very provisions of the contract which violate the relevant statutes; and there is no room for the doctrine, on which Virginia Dare in part relies, that contracts which are merely collateral to activities in violation of the Sherman Act may be enforced, and that legal portions of a contract which are severable from illegal sections thereof may be the subject of suit. For the same reasons the original suit of Norfolk Southern must fail; and in its case it may be added that until Norfolk Southern itself denounced the contract, Virginia Dare performed all the promises on its part, and that a contract to pay for services cannot be implied in the face of an express agreement that they shall be performed without charge if certain conditions are met. See Municipal Waterworks Co. v. City of Ft. Smith, D.C.W.D.Ark., 216 F. 431, 438; Lueddecke v. Chevrolet Motor Co., 8 Cir., 70 F.2d 345, 348; Sickelco v. Union Pacific R. Co., 9 Cir., 111 F.2d 746, 750; Jarka Corporation of Baltimore v. Pennsylvania R. Co., D.C.D.Md., 42 F. Supp. 371, 376, affirmed, 4 Cir., 130 F.2d 804, 806. Cf. Baltimore & Ohio R. Co. v. United States, 261 U.S. 592, 598, 43 S.Ct. 425, 67 L.Ed. 816; Ross Engineering Co. v. Pace, 4 Cir., 153 F.2d 35, 45; Restatement, Contracts §§ 514, 598; 5 Williston on Con-

---

[2] We are not unmindful of the fact that agreements for the joint use of terminal facilities and for pickup and delivery service require no specific authorization from the Commission. Universal Cartage Co.—Purchase—Dixie Cartage Co., 37 M.C.C. 107, 110; Consolidated Freight Lines, Inc., Com. Car. Application, 11 M. C.C. 131, 136; but the agreement in suit also included a provision for the division of traffic and revenues therefrom.

tracts (6th Ed. 1937) § 1630. The parties are in pari delicto and neither may recover.

The judgment of the District Court against Norfolk Southern on its original claim will be affirmed, and the judgment in favor of Virginia Dare on its counterclaim will be reversed and the case will be remanded to the District Court with instructions to enter a judgment against Virginia Dare on the counterclaim.

Affirmed in part, reversed in part, and remanded.